**Shields v. Fafard**

C.P. of Lackawanna County, No. 09 CV 8636

*Neil F. MacDonald* and *John D. Nardone*, for plaintiff.

*Wendy M. Schneider*, for defendant.

NEALON, *J.*, August 23, 2013—Following a verdict of $3,720.00 in this admitted liability case, plaintiff has filed a motion for a new trial on the ground that the defense medical witness was allegedly permitted to testify beyond the fair scope of his pre-trial reports, in contravention of Pa.R.C.P. 4003.5(c), by discussing an MRI report dated May 9, 2009, and an office note authored by plaintiff's treating physician on November 8, 2008. The trial record reflects that plaintiff failed to timely object to the defense witness's original testimony concerning those matters, and in the process, waived her objections to that testimony. In addition, the expert's pre-trial reports did reference the treating physician's diagnosis and treatment of plaintiff and the fact that an MRI was ordered in May 2009, as a result of which plaintiff was not unfairly surprised by the expert's reasonable explanation of his written words. More importantly, since plaintiff was subsequently able

to secure the medical testimony of an expert witness to rebut the defense expert's opinions in that regard, she was not prejudiced by the admission of that testimony. Accordingly, her motion for a new will be denied.

## I. FACTUAL BACKGROUND

### (A) INTRODUCTION

This personal injury suit stems from an automobile accident which occurred on July 24, 2008, when a vehicle operated by plaintiff, Marilynn Shields ("Shields"), was struck from behind by an automobile driven by defendant, Christina M. Fafard ("Fafard"). Fafard admitted liability for the accident, and a trial was conducted solely on the issue of damages. (Transcript of Proceedings ("T.P.") on 4/2/13 at pp. 5-6, 51-52). The parties presented conflicting medical testimony regarding the nature and extent of Shields' injuries that were causally related to the accident, and since the defense medical expert witness conceded that the accident caused soft tissue sprains that resolved shortly thereafter, the jury was instructed that it "must at least award some damages for those undisputed injuries." (T.P. 4/4/13 at p. 5).

Shields argued at trial that the accident caused a herniated disc at L4-5, required her to undergo a lumbar decompression discectomy, and resulted in permanent residual pain and disability. (T.P. 4/2/13 at pp. 24, 34, 36-39, 42-46; T.P. 4/4/13 at pp. 50-51, 63-69). She further asserted that since the L2-3 disc directly above her surgical site has been forced to bear a greater load following her surgery at the L3-4 and L4-5 levels, the L2-3 disc has become more stenotic and she has developed "next level syndrome." (T.P. 4/4/13 at pp. 66-67). Shields sought to recover damages for unpaid, past medical expenses

totaling $5,952.50, projected future medical expenses of $221,000.00, past and future loss of earnings in the amount of $42,000.00, and past and future non-economic loss. (T.P. 4/4/13 at pp. 69-80).

Fafard maintained that the accident caused minor cervical and lumbosacral sprains and an exacerbation of pre-existing degenerative disc disease, which resolved within six weeks of the accident. (T.P. 4/4/13 at pp. 19-20, 32). Relying upon Shields' extensive prior treatment for low back pain, including two pre-accident magnetic resonance imaging ("MRI") scans, Fafard argued that Shields' disc injury, surgery and continued pain were attributable to her longstanding "pre-existing condition that has evolved over time." (T.P. 4/2/13 at pp. 53, 55; T.P. 4/4/13 at pp. 21-22, 25-31). Characterizing the accident as a "very low speed minor impact," (T.P. 4/2/13 at p. 54), Fafard asserted that only "about $500.00" of Shields' past medical expenses were attributable to her accident-related injuries, (T.P. 4/4/13 at p. 39), and maintained that no damages should be awarded for any alleged loss of earnings. (*Id.* at pp. 37-38). Fafard submitted that Shields should be "compensated for the injury that she sustained as a result of this accident, but only as a result of this accident, not because she has continuing problems that are a progression of her pre-existing condition." (*Id.* at p. 39).

### (B) PRIOR INJURIES AND TREATMENT

Shields admitted during her trial testimony that prior to her accident on July 24, 2008, she was involved in automobile accidents on July 7, 2006, and January 4, 2007, and injured her neck and low back in those two earlier accidents. (T.P. 4/2/13 at pp. 65-66, 125-126, 130-131). Even prior to the first accident on July 7, 2006, Shields

was treating with a neurologist, Dr. Vithalbhai Dhaduk, for radiating low back pain that caused numbness and tingling in her legs. (*Id.* at pp. 128, 150). In March 2006, Dr. Dhaduk ordered an MRI scan and EMG/nerve conduction study of Shields' low back, and also performed nerve block injections in her lumbar spine area. (*Id.* at pp. 128-129). The MRI that was conducted on March 11, 2006, revealed broad based, right-sided disc bulging at L3-4 with mild canal stenosis and mild to moderate right-sided foraminal narrowing, broad based disc bulding at L4-5 with a small central disc protrusion causing moderate canal stenosis and mild bilateral foraminal narrowing, and advanced L5-S1 degenerative disc disease with spondylosis and facet hypertrophy resulting in mild to moderate bilateral foraminal narrowing. (Defendant's exhibit no. 6).

Following her prior accidents in July 2006 and January 2007, Shields continued to treat with Dr. Dhaduk for radiating low back pain that caused numbness and tingling in her legs. (T.P. 4/2/13 at pp. 65-66, 125-126, 130-132). In May 2007, she sought treatment from another neurologist, Dr. Leroy J. Pelicci, who performed an additional EMG/ nerve conduction study. (*Id.* at pp. 132-133). On May 12, 2007, Shields had a second MRI scan performed, (*Id.* at pp. 135-135), which revealed "marked narrowing of the L3-L4 disc space" with "significant bilateral neural foraminal encroachment," "prominent indentations upon the dural sac at L3-L4 and L4-L5 levels," "concentric protrusion with a central extrusion indenting the dural sac" at the L4-L5 disc space causing a "mild to moderate degree of central canal stenosis," and a "severely narrowed and desiccated" L5-S1 disc space with "severe degenerative changes of the intervertebral joints, as well as a concentric protrusion" that "extend[ed] within the neural foramina

creating a mild degree of encroachment of the structures." (Defendant's exhibit no. 1). On April 15, 2008, Shields' primary care physician diagnosed her with fibromyalgia. (T.P. 4/2/13 at pp. 136-137). Approximately one month before the automobile accident with Fafard, Shields fell and broke her left foot. (*Id.* at pp. 138, 154).

On July 24, 2008, Shields was involved in the subject accident with Fafard. There was no visible damage to either car, and when Fafard contacted the police to report the accident, "the police said they weren't going to come because no one was injured." (T.P. 4/3/13 at pp. 22-24). Shields drove her vehicle from the accident scene and did not seek immediate medical treatment. (T.P. 4/2/13 at p. 79). She eventually treated with her primary care physician four days later on July 28, 2008. (*Id.* at pp. 80-81).[1]

### (C) MEDICAL EVIDENCE

On August 1, 2008, Shields underwent a third MRI study which demonstrated degenerative "retrolisthesis," "mild facet hypertrophy" and "a broad-based disc bulge" at L3-4 causing "moderate central canal stenosis," "moderate bilateral facet hypertrophy" and "a broad-based disc bulge in addition to a central disc protrusion" at L4-5 producing "severe central canal stenosis," and "mild bilateral facet hypertrophy" and "a broad-based disc bulge causing borderline canal narrowing" at L5-S1. (Defendant's exhibit no. 2). The final impression of the interpreting radiologist was "multi-level central spinal stenosis, most severe at L4-5, related to disc material and posterior element hypertrophy." (*Id.* at p. 2). During her subsequent examination by her primary care physician,

---

1. One week later, she fell down stairs on August 4, 2008, and broke her right ankle. (*Id.* at pp. 82-83, 138-140).

Dr. Lisa Robertson, on November 10, 2008, Shields had a normal neurologic and musculoskeletal examination which revealed "[n]o spasm bilaterally," "[n]o tenderness of the spine," a full range of motion "with no pain," and normal palpation of the spine and lower extremities. (Defendant's exhibit no. 7).

During the trial, Shields introduced the expert testimony of her treating physiatrist, Lucian P. Bednarz, M.D., and an orthopedic surgeon, Alan P. Gillick, M.D., who performed her low back surgery on May 28, 2009. Although other physiatrists in Dr. Bednarz's practice group began treating Shields on December 4, 2008, and provided physical therapy and injection treatment to her, she did not come under the care of Dr. Bednarz until November 22, 2011, more than two years after her surgery. (Trial deposition of Lucian P. Bednarz, M.D., dated 4/1/13 at pp. 13, 26-29, 47). Dr. Bednarz testified regarding his treatment of Shields on November 22, 2011; January 23, 2012; March 5, 2012; May 7, 2012; December 18, 2012; and March 18, 2013. (*Id.* at pp. 47-58).

Dr. Bednarz provided testimony relative to Shields' third MRI scan on August 1, 2008, and her fourth MRI study on May 8, 2009, and contrasted the radiographic findings reflected on the 2008 MRI scan and the 2009 MRI scan. (*Id.* at pp. 30-31, 37, 42-46, 88-90). He opined that the MRI scan of May 8, 2009, revealed that the "disrupted disc at L4-5 progressed" and corroborated Shields' "obvious changes clinically." (*Id.* at p. 46). He also testified with respect to a fifth MRI scan that was conducted on March 27, 2013, and stated that it reflected the development of "next level syndrome" at the L2-L3 disc space due to increased stress upon that level which

was causing greater central canal stenosis. (*Id.* at pp. 59-62).

Dr. Bednarz opined that Shields had a "traumatic disc herniation at L4-5," and stated that all of her treatment by his practice group, Northeastern Rehabilitation Associates, was causally related to the automobile accident on July 24, 2008. (*Id.* at pp. 73, 83, 93-94). He further testified that Shields will require future medical treatment consisting of physical therapy, epidural steroid injections, and possible surgery at the L2-L3 disc level. (*Id.* at pp. 63-64, 67-73). On cross-examination, Fafard's counsel interrogated Dr. Bednarz concerning Shields' prior accidents and lumbar injuries, as well as her multiple MRI scans on March 11, 2006; May 12, 2007; August 1, 2008; and May 8, 2009. (*Id.* at pp. 75, 78-80, 82-84, 93). Dr. Bednarz testified that Shields' herniated disc was established by radiographic proof of the "tear [of] the outer part of the disc," but he conceded that he could not state when that tear occurred. (*Id.* at p. 83).

Dr. Gillick testified that he first examined Shields on May 13, 2009, following a referral by Dr. Bednarz's partner, Dr. Paul Horchos. (Trial deposition of Alan P. Gillick, M.D., dated 2/22/13 at p. 11). Not unlike Dr. Bednarz, Dr. Gillick was questioned on direct examination about Shields' 2008 and 2009 MRI scans. (*Id.* at pp. 14-15, 17-18). He testified that he diagnosed Shields with spinal stenosis at L3-4 and L4-5 with a right-sided disc herniation at L4-5, as a result of which he performed bilateral lumbar decompression surgery at the L3-4 and L4-5 disc levels, with a right-sided L4-5 discectomy. (*Id.* at pp. 19-20, 23-26). When he last examined Shields on July 6, 2009, she "was doing excellent" and stated that she "was virtually pain free," and Dr. Gillick's office note

on that date indicated that his "prognosis was optimistic." (*Id.* at pp. 29, 33, 71).

Based upon the history that Shields had provided to Dr. Gillick, his physical examination of her and his review of her post-accident diagnostic studies, Dr. Gillick opined that Shields' herniated disc was caused by the automobile accident on July 24, 2008. (*Id.* at pp. 18-19, 23, 44-45, 61-62). On cross-examination, Dr. Gillick acknowledged that Shields had not advised him of her prior automobile accidents and low back injuries, nor was he ever provided with her medical treatment records which predate July 24, 2008. (*Id.* at pp. 47-52, 70-71). Fafard's counsel also questioned Dr. Gillick extensively concerning the third MRI scan on August 1, 2008, and the fourth MRI scan on May 8, 2009. (*Id.* at pp. 54-64).

Fafard presented the expert testimony of Michael C. Raklewicz, M.D., who examined Shields pursuant to Pa.R.C.P. 4010. Without objection by Shields, Dr. Raklewicz testified regarding Shields' MRI report dated May 8, 2009, and compared the findings reported on that study with the results of an earlier MRI scan on August 1, 2008. (Trial deposition of Michael C. Raklewicz, M.D., dated 2/27/13 at pp. 37-38). Dr. Raklewicz stated that unlike the 2008 MRI scan, the 2009 MRI study demonstrated a new finding comprised of a large disc herniation with extensive caudal migration. Specifically, Dr. Raklewicz testified as follows:

Q. And what does that [2009] MRI report of the lumbar spine indicate to you when you compare it to the condition reported in the August 2008 MRI report?

A. Well, at L3-4, again, there's retrolisthesis, disc

bulge eccentric, superimposed right foraminal and far lateral disc protrusion, severe central canal stenosis. At L3-4, there's been a natural progression of the spinal stenosis, moderate to severe, moderate left neural foraminal narrowing. Again, that would appear to be just a progression of these other three MRIs.

However, at L4-5, there's a radically different reading...., there is a large superimposed central right paracentral and right lateral disc extrusion demonstrating approximately 1.7 centimeters of caudal migration into the right lateral recess significantly compressing the thecal sac and severely compressing the right L5 nerve root. There is moderate to severe neural foraminal narrowing bilaterally.

So now, this is a completely different nature. This is a massive — the final reading is — a massive right paracentral lateral disc extrusion at L4-5 with extensive caudal migration. In other words, a disc has squirted out of the disc space and squirted out laterally and into the — compressing the thecal sac. This is completely different than these other three MRIs.

Q. Is that a new finding since the August 2008 MRI report?

A. Yes.

Q. Was that condition present immediately following the July 2008 automobile accident that we're here about today?

A. Well, this MRI was taken — the August 1, 2008, MRI — was taken...within a month, certainly, of the auto accident. And, no, this is spinal stenosis, spinal

lumbar spondylosis.

This MRI, which is ten months later, or thereabouts, after this MRI, and, what, ten months after the accident, now shows a massive right paracentral lateral disc extrusion with extensive caudal migration. That's a completely — that's a horse of a different color. Now you have a large herniated disc.

(*Id.* at pp. 38-40).

As noted above, Shields did not lodge a timely objection to any of the above-quoted testimony. However, after Dr. Raklewicz was then asked whether "the massive disc extrusion occurred as a result of the July 2008 automobile accident," and Dr. Raklewicz replied "no, that's not possible" because the "MRI immediately after the accident" in August 2008 did not reveal a large disc extrusion with compression on the L5 nerve root, counsel for Shields objected on the basis that "the testimony the doctor just provided is well beyond anything that's in his report." (*Id.* at pp. 40-41).

Dr. Raklewicz also testified concerning the November 2008 records of Shields' treating physician, Dr. Lisa Robertson. Without objection, Dr. Raklewicz was questioned regarding the records of Dr. Robertson's examination and treatment of Shields on November 10, 2008, less than four months after the accident on July 24, 2008. (*Id.* at pp. 44-45). Dr. Raklewicz testified that Dr. Robertson reported "a normal musculoskeletal exam," which included "normal palpation, no tenderness to spine, no joint restrictions, normal lower extremities" and normal strength testing. (*Id.* at p. 45). However, when Dr. Raklewicz was then asked if Dr. Robertson "noted that

[Shields] was without pain and able to move without any limitations as of November 10, 2008," Shields objected to that question as "completely leading" and addressing a medical record that Dr. Raklewicz did not reference in his pre-trial reports. (*Id.* at pp. 45-47).

Dr. Raklewicz was subsequently asked whether it was "possible for the condition noted on the May 2009 MRI to have existed at the time that the November 2008 physical exam" was performed by Dr. Robertson, and Shields asserted "a standing objection" to any such testimony as being beyond the fair scope of Dr. Raklewicz's pre-trial reports. (*Id.* at pp. 48-49). Dr. Raklewicz replied that he could not "imagine a patient having normal range of motion and a normal examination or straight leg raising" test with "a massive right paracentral disc extrusion at L4-5," which "would cause significant distress to a patient." (*Id.* at pp. 49-50). Dr. Raklewicz testified that in the course of his experience as an orthopedic surgeon, he has never had a patient who presented with "such a massive extrusion or herniation," but nonetheless had a normal examination and did not report pain. (*Id.* at p. 50).

Dr. Raklewicz opined that the accident caused a temporary "exacerbation of pre-existing...cervical and lumbar spondylosis," which would have completely resolved within six weeks. (*Id.* at pp. 53, 55). He further stated that Shields' medical treatment beyond that six week period is not related to the automobile accident, and instead is "secondary to her underlying lumbar and cervical spondylosis." (*Id.* at pp. 54-55). Dr. Raklewicz likewise testified that Shields' lumbar disc surgery was not in any way caused or accelerated by the accident. (*Id.* at p. 54). He never opined that Shields' herniated disc or resulting surgery was attributable to a traumatic incident

which occurred between the August 1, 2008, MRI and the May 8, 2009, MRI.

### (D) MOTIONS IN LIMINE

On the first day of trial, Fafard filed a motion in limine with respect to the impending trial testimony of Shields' treating physiatrist, Dr. Bednarz, and Shields presented a motion in limine seeking to strike certain portions of the trial deposition that had been conducted of the defense medical witness, Dr. Raklewicz, on February 27, 2013. Fafard sought to bar Shields from questioning Dr. Bednarz concerning his office notes of December 18, 2012, and March 18, 2013, since Shields' counsel did not provide those records to defense counsel until three business days before trial and well after the trial deposition of Dr. Raklewicz had been completed. (T.P. 4/1/13 at pp. 3-13, 30-34). Noting that Dr. Bednarz's medical report dated April 10, 2012, merely opined that Shields suffered from a partial disability, Fafard argued that Dr. Bednarz's new opinion in his belatedly produced records, stating that Shields was permanently disabled, greatly prejudiced the defense since their medical witness could not rebut that revised disability opinion. (*Id.* at pp. 16-17, 30-34). Although "troubled" by Shields' failure to produce the office note of December 18, 2012, in advance of Dr. Raklewicz's trial deposition, we denied the motion in limine on the ground that Dr. Raklewicz had adequately addressed Shields' alleged disability by opining that her accident-related injuries had resolved within six weeks, i.e., Fafard had failed to demonstrate sufficient prejudice to warrant the exclusion of Dr. Bednarz's proffered testimony. (*Id.* at pp. 38-40).

In Shields' motion in limine, she sought to preclude

certain testimony by Dr. Raklewicz as allegedly beyond the fair scope of his pre-trial reports, including any testimonial reference by him to the MRI scan of May 8, 2009, and Dr. Robertson's office note of November 8, 2008. (*Id.* at pp. 43-48). As reflected in his above-quoted testimony, Dr. Raklewicz contrasted the findings on the 2008 MRI scan and the 2009 MRI study, and stated that the latter MRI revealed a new finding comprised of a "massive" L4-5 disc protrusion that compressed the thecal sac. Dr. Raklewicz also testified that the "large herniated disc" was not present on the 2008 MRI scan. (Dr. Raklewicz depo. at pp. 38-40). Since Shields did not raise a timely objection to that testimony during Dr. Raklewicz's deposition, her objection was overruled as waived. (T.P. 4/1/13 at pp. 48-52, 67-68, 86). However, inasmuch as she asserted a contemporaneous objection to the ensuing question posed to Dr. Raklewicz, the objection was sustained as beyond the fair scope of Dr. Raklewicz's reports. (*Id.* at pp. 84-86).

With respect to Dr. Robertson's record of November 8, 2008, that objection was overruled since Dr. Robertson's records were referenced in Dr. Raklewicz's report dated September 13, 2012. (*Id.* at pp. 86-87). Furthermore, since Dr. Raklewicz had already testified, without objection, that the "massive" disc herniation was not present on the 2008 MRI, and he was permitted to discuss Dr. Robertson's report of November 8, 2008, referencing Shields' normal examination and absence of pain complaints, he was also allowed to opine that Shields' examination would not have been normal on November 8, 2008, if she had a "massive disc extrusion at L4-5" on that date. (*Id.* at pp. 87-88). Three other objections that were raised to Dr. Raklewicz's testimony were sustained and his responses were stricken.

(*Id.* at pp. 87, 88, 89).

### (E) POST-TRIAL MOTION

In response to special verdict interrogatories in accordance with Pa.R.C.P. 223.3, the jury awarded $1,270.00 for past medical expenses; $1,000.00 for past loss of earnings; $1,200.00 for past and future pain, suffering, embarrassment and humiliation; $250.00 for past and future loss of enjoyment of life; and $0 for future medical expenses, future loss of earning capacity, and past and future disfigurement. (T.P. 4/4/13 at pp. 91-92). Shields filed a timely "Motion for Post-Trial Relief Pursuant to Pa.R.C.P. 227.1" seeking a new trial on the ground that Dr. Raklewicz was allegedly permitted to testify beyond the fair scope of his pre-trial reports by discussing the lumbar MRI scan of May 9, 2009, and Dr. Robertson's clinic note of November 8, 2008.[2] (Docket entry no. 27 at ¶¶4-37). A scheduling order was issued with respect to the transcription of the trial record, the filing of briefs, and the date of oral argument on Shields' post-trial motion. (Docket entry no. 28). Following the completion of oral argument on July 15, 2013, this matter was submitted for a decision.

### II. DISCUSSION

### (A) STANDARD OF REVIEW

When considering a request for a new trial under Pa.R.C.P. 227.1(a)(1), the trial court must undertake a two-step process. *See Harman v. Borah*, 562 Pa. 455, 467, 756 A.2d 1116, 1122 (2000). First, the trial court must decide whether one or more mistakes occurred at trial.

---

2. Shields did not file a motion requesting delay damages under Pa.R.C.P. 238, and thereby waived her right to any prejudgment interest.

*Huber v. Etkin*, 58 A.3d 772, 776 (Pa. Super. 2012), *app. denied*, 68 A.3d 909 (Pa. 2013); *White v. Behlke*, 2009 WL 1904102, at * 15 (Lacka. Co. 2009), *aff'd*, 15 A.3d 523 (Pa. Super. 2010), *app. denied*, 614 Pa. 689, 39 A.3d 991 (2012). Second, if the trial court concludes that a mistake occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. *Lockley v. CSX Transportation, Inc.*, 5 A.3d 383, 388 (Pa. Super. 2010), *app. denied*, 613 Pa. 668, 34 A.3d 831 (2011). Since the harmless error doctrine underlies every decision to grant or deny a new trial, *Huber, supra*, "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Bennett v. A. T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 149-150 (Pa. Super. 2012) (quoting *Harman, supra*); *Scranton Laminated Label. Inc. v. Florimonte*, 2013 WL 1345805, at * 8 (Lacka. Co. 2013).

(B) Pa.R.C.P. 4003.5(c) OBJECTIONS

The sole basis for Shields' request for a new trial relates to the admission of Dr. Raklewicz's testimony pertaining to the 2009 MRI scan and Dr. Robertson's office note of November 8, 2008. "A trial court is vested with wide discretion in deciding whether to allow the admission of expert testimony into evidence," *Daddona v. Thind*, 891 A.2d 786, 805 (Pa. Cmwlth. 2006), *app. denied*, 589 Pa. 732, 909 A.2d 306 (2006), and its ruling regarding the admission or exclusion of evidence will only be disturbed for an abuse of discretion or an error of law. *Ferko-Fox v. Fox.* 68 A.3d 917, 928 (Pa. Super. 2013); *Fazio v. Guardian Life Ins. Co. of America*, 62 A.3d 396, 412 (Pa. Super. 2012). Furthermore, even if evidence

is erroneously admitted, "the erroneous admission of evidence is not considered ground for a new trial where no harm or prejudice has resulted." *Pittsburgh Const Co. v. Griffith*, 834 A.2d 572, 585 (Pa. Super. 2003), *app. denied*, 578 Pa. 701, 852 A.2d 313 (2004).

Dr. Raklewicz authored two pre-trial reports: one dated February 16, 2009, based upon his review of Shields' medical records; and a second report dated September 13, 2012, following his examination of Shields on September 10, 2012. (*See* Defendant's exhibit nos. 4-5). In his first report of February 16, 2009, Dr. Raklewicz reviewed Shields' pre-accident injuries and treatment, including her prior MRI studies. (Defendant's exhibit no. 4 at pp. 1-2). He concluded that prior to the accident on July 24, 2008, Shields "had very severe cervical and lumbar spondylosis that caused her difficulties at work and that the patient required treatment for" in 2005, 2006, 2007 and 2008. (*Id.* at p. 2). He stated in his initial report that "clearly the auto accidents of July 6, 2006, January 4, 2007, and July 24, 2008, did not cause cervical spondylosis and lumbar spondylosis," and at most caused those conditions to be exacerbated "for up to six weeks." (*Id.* at p. 3). Dr. Raklewicz further concluded that Shields' "treatment of multiple injections and physical therapy for several years is not related to her current auto accident," and that the only causally related medical care "would have [been] pain control, rest and minor physical therapy for up to six weeks after each accident." (*Id.*).

In his second report, Dr. Raklewicz discussed the history that he obtained from Shields, his physical examination of her, his review of her pre-accident and post-accident medical records, and his conclusions concerning her accident-related injuries. Dr. Raklewicz referenced

Shields' treatment by "Dr. Lisa Robertson" who "referred her to a pain specialist at Northeast Rehab." (Defendant's exhibit no. 5 at p. 2). He noted that Shields was diagnosed with fibromyalgia "two years ago by her family physician, Dr. Lisa Robertson," and stated that her "current treatment at this time is by Dr. Robertson and evidently, Dr. Bednarz." (*Id.*). Dr. Raklewicz also discussed the 2009 clinical "notes from Northeast Rehabilitation Associates," and stated in that same paragraph that "an MRI showed stenosis and disc bulging." (*Id.* at p. 6).

Dr. Raklewicz indicated in his report that Shields "was seen back on 5/7/2009 again" by Northeast Rehabilitation Associates, "was given an appointment with Dr. Gillick for spinal stenosis and possible disc surgery, and another MRI was ordered." (*Id.*). However, his second report did not specifically identify the results of that MRI scan on May 9, 2009. Dr. Raklewicz opined that the accident on July 24, 2008, "could've caused a lumbar or cervical sprain, which is clearly an exacerbation of the pre-existing injury and a self-limiting process that I would not think would cause additional pain for more than six weeks." (*Id.*). Thus, he concluded his report by stating that "I do not feel that the automobile accident of July 24, 2008, caused or accelerated Ms. Shields' need for surgery, nor any ongoing, current treatment for her complaints." *Id.*

Shields contends that it was reversible error to permit Dr. Raklewicz to testify about the 2009 MRI study and Dr. Robertson's record of November 8, 2008, since those matters were not addressed in his pre-trial reports. However, as reflected in Section I(C) above, Dr. Raklewicz testified, *without objection*, regarding the findings on the 2008 and 2009 MRI scans, the "radically different" finding on the 2009 MRI scan consisting of "a massive right paracentral

lateral disc extrusion at L4-5 with extensive caudal migration," and the absence of that "large herniated disc" on the 2008 MRI scan that was conducted shortly following the accident. (Dr. Raklewicz depo. at p. 38, line 18 to p. 40, line 6). Similarly, Dr. Raklewicz testified concerning Dr. Robertson's records and her notation on November 8, 2008, that Shields' musculoskeletal examination was completely normal on that date. (*Id.* at p. 44, line 16 to p. 45, line 16). Once again, no timely objection was raised to that line of questioning. (*Id.*).

To secure post-trial relief based upon the erroneous admission of expert testimony, the party seeking a new trial must have preserved that evidentiary issue by making a contemporaneous objection to the expert's testimony at trial. *See McEwing v. Lititz Mutual Ins. Co.*, 2013 WL 3378977, at * 8 (Pa. Super. 2013). "It is axiomatic that, in order to preserve an issue for review, litigants must make timely and specific objections during trial" to the expert witness testimony. *In re R.P.*, 957 A.2d 1205, 1222 (Pa. Super. 2008). If trial counsel fails to lodge a timely, specific objection during the trial, the purported error is waived. *See Ludmer v. Nernberg*, 433 Pa. Super. 316, 330, 640 A.2d 939, 946 (1994), *app. denied*, 541 Pa. 652, 664 A.2d 542 (1995), *cert. denied*, 517 U.S. 1220 (1996). Since Shields did not assert a timely objection to Dr. Raklewicz's foregoing testimony relating to the 2009 MRI scan and Dr. Robertson's note of November 8, 2008, she has waived her objection to that testimony. Moreover, inasmuch as Dr. Raklewicz did in fact reference Dr. Robertson's treatment of Shields in his report of September 13, 2012, his discussion of her examination of Shields was not beyond the fair scope of his pre-trial reports.

In addition, Shields contends that the following

testimony by Dr. Raklewicz relating to the 2009 MRI scan should have been precluded under Pa.R.C.P. 4003.5(c):

Q. If you take into consideration Ms. Shields' family doctor note of November 2008 with the condition that is described in the May — May 8, 2009, MRI of the lumbar spine, is it possible for the condition noted in the May 2009 MRI to have existed at the time the November 2008 physical exam was made?

A. The question is, would that exam have been normal with this MRI, a massive right paracentral disc extrusion at L4-5, with extensive caudal migration. Massive herniated discs at any level, let alone 4-5, with significant thecal sac and severe compression of the right L5 nerve root, I can't imagine a patient having normal range of motion and a normal examination or straight leg raising, for that matter. That, I think, would cause significant distress to a patient.

Q. In your 25 years of experience doing spinal surgery, and your over 25 years experience — over 30 years experience in the orthopedic field, have you ever — have you ever had a patient that would have such a massive extrusion or herniation present that would be able to withstand an examination and show normal, within limits, and no pain?

A. In my experience, no.

(Dr. Raklewicz depo. at p. 48, lines 6 to 13 and p. 49, line 18 to p. 50, line 11). Shields raised a timely objection to that testimony on the ground that it was beyond the fair scope of Dr. Raklewicz's pre-trial reports. (*Id.* at p. 48, line 14 to p. 49, line 13). Shields submits in her post-trial motion that Dr. Raklewicz was improperly allowed

to opine that Shields "sustained the lumbar disc herniation after the August 1, 2008 MRI but before the May 8, 2009 MRI, and [that] the surgery performed by Dr. Gillick was necessitated by an intervening traumatic event." (Docket entry no. 27 at ¶6).

If an expert witness has authored a pre-trial report as a discovery response under Pa.R.C.P. 4003.5(a)(1), "the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her separate report, or supplement thereto." Pa.R.C.P.4003.5(c). "No hard and fast rule exists for determining when a particular expert's testimony exceeds the fair scope of his or her pre-trial report," *Woodard v. Chatterjee*, 827 A.2d 433, 442 (Pa. Super. 2003), and in making that determination, "the accent is on the word 'fair.'" *Callahan v. National Railroad Passenger Corp.*, 972 A.2d 866, 877 (Pa. Super. 2009), *app. denied*, 608 Pa. 651, 12 A.3d 750 (2010). The use of the phrase "fair scope" in Rule 4003.5(c) contemplates "a reasonable explanation or even an enlargement of the expert's written words." *Daddona*, 891 A.2d at 806 (quoting *Hickman v. Fruehauf Corp.*, 386 Pa. Super. 455, 459, 563 A.2d 155, 157 (1989), *app. denied*, 528 Pa. 611, 596 A.2d 151 (1991)).

"The expert is not required to give a basic primer on medicine in his or her report or draft it for a complete neophyte in the field." *Schaaf v. Kaufman*, 850 A.2d 655, 667 (Pa. Super. 2004), *app. denied*, 582 Pa. 719, 872 A.2d 1200 (2005). The question presented by a "fair scope" challenge "is whether, under the circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to

the nature of the appropriate response." *Callahan, supra* (quoting *Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 59 (Pa. Super. 2004)). Thus, "a trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness." *Daddona*, 891 A.2d at 805. "A fully realized defense includes the presentation of an expert witness to rebut the evidence offered by the opposing party." *Schweikert v. St. Luke's Hospital*, 886 A.2d 265, 268 (Pa. Super. 2005).

Due to the lack of a timely objection, Dr. Raklewicz was properly permitted to testify about the "massive" disc herniation that was present on the 2009 MRI scan, but not on the 2008 MRI study, (Dr. Racklewicz depo. at p. 37, line 18 to p. 40, line 6), as well as regarding Dr. Robertson's normal musculoskeletal examination of Shields on November 10, 2008. (*Id.* at p. 44, line 16 to p. 45, line 16). His subsequent testimony to the effect that a patient with a massive disc herniation would not have a normal physical examination was simply a logical extension of earlier medical testimony that was admitted without objection. Additionally, Dr. Raklewicz's report of September 13, 2012, expressly referenced Dr. Robertson's treatment and the fact that another MRI scan was ordered in May 2009. For that reason, the two questions challenged by Shields represented "a reasonable explanation or even an enlargement" of Dr. Raklewicz's "written words" in his report.

The trial record reflects that counsel for both parties questioned Dr. Gillick and Dr. Bednarz at length concerning the findings on the 2008 and 2009 MRI scans. Shields is hard pressed to argue that she was surprised and unfairly prejudiced by Dr. Raklewicz's discussion of those

MRI studies and Dr. Robertson's normal examination in November 2008. Contrary to Shields' contention, Dr. Raklewicz did not opine or suggest that "an intervening traumatic event" between August 1, 2008, and May 8, 2009, caused Shields' herniated disc. Rather, he consistently stated that Shields' current complaints were attributable to her pre-existing degenerative condition which had naturally progressed irrespective of the accident.

Nor has Shields demonstrated that she suffered prejudice as a result of Dr. Raklewicz's foregoing testimony. If the objecting party is able to prepare and present a rebuttal witness to challenge the evidence which purportedly exceeded the fair scope of pre-trial reports, the requisite prejudice simply does not exist. *See Daddona, supra; Schweikert, supra.* Shields conducted the trial deposition of Dr. Bednarz *after* the trial deposition of Dr. Raklewicz and the ruling denying Shields' motion in limine. Dr. Bednarz addressed the 2008 and 2009 MRI scans and the findings of Shields' treating physicians in his testimony on April 1, 2013. As a consequence, Shields was capable of presenting an expert witness to rebut Dr. Raklewicz's opinions. Therefore, she was not prejudiced by Dr. Raklewicz's testimony and is not entitled to a new trial based upon the admission of that testimony. *See Whitaker v. Frankford Hospital of City of Philadelphia,* 984 A.2d 512, 522 (Pa. Super. 2009) ("Therefore, the opposing party must be prejudiced as a result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error."). An appropriate order follows.

## ORDER

And now, this 23rd day of August, 2013, upon

consideration of "Plaintiff's Motion for Post-Trial Relief Pursuant to Pa.R.C.P. 227.1," the memoranda of law submitted by the parties, and the oral argument of counsel on July 15, 2013, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. Plaintiff's motion for post-trial relief pursuant to Pa.R.C.P. 227.1 is denied; and

2. The Clerk of Judicial Records is directed to enter judgment in favor of plaintiff, Marilynn Shields, and against defendant, Christina M. Fafard, in the amount of $3,720.00.